IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 06 CR 861 |
| | ) | |
| v. | ) | Judge Ronald A. Guzmán |
| | ) | |
| JOSE ARREOLA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### I. Background

Defendant, Jose Areola, seeks to suppress 233 kilograms of cocaine recovered from his home on November 17, 2005 pursuant to a warrantless search. An evidentiary hearing was held on June 19, 2007. The parties have now submitted briefs in support of their positions.

### II. Facts

On November 16, 2005, information was given to officers of the Chicago Police Department from a confidential informant regarding a person nicknamed "El Viejo." (Tr. 41.) The informant's only description of "El Viejo" was that he was a male Hispanic in his 40s and that he had black hair and a mustache. (*Id.* 42.) The informant told the police officers that "El Viejo" would arrive for a meeting at a Walgreen's store at Cermak and Austin in a blue Ford Explorer with an Indiana license plate on that day. (*Id.* 44-47, 52.) There was no evidence

presented at the hearing that the informant told the officers that any illegal actions were going to take place at that time other than discussions of a possible narcotic transaction. (*Id.* 42, 52.)

In response to the tip, surveillance was conducted upon the parking lot of the Walgreen's store. (*Id.* 47.) As predicted by the informant, a blue Explorer arrived at the location. (*Id.*) A male Hispanic, identified in court as the defendant, exited the vehicle, met with another man and the two men entered the Walgreen's store. A short time later the men exited the Walgreen's. (*Id.*)

The officers continued their surveillance of the blue Explorer, which arrived at the alley behind 3417 North Keeler, Chicago, Illinois. (*Id.* 48.) Someone unknown to the officers exited the residence, approached the vehicle through the gangway, retrieved two duffel bags from the back of the blue Explorer and returned to the residence. (*Id.* 49.) Some of the officers remained at the residence to continue surveillance on it, while others continued their surveillance of the blue Explorer. (*Id.*) The officers are unaware of the identity of the person who retrieved the duffel bags from the car or what that person's relationship was to the driver. (*Id.* 81.)

On November 17, 2005, officers received another call from the same informant. This time, the informant told the officers that a fifty kilogram cocaine delivery was to occur between the person known as "El Viejo" and an unknown individual in the same Walgreen's parking lot. (*Id.* 53-54.) He stated that "El Viejo" would be driving a Chevy Malibu and supplied the Illinois license plate. The license plate that was given was registered to Jose Arreola at 6535 West 16th Street, Berwyn, Illinois. (*Id.* 55.)

2

Officers then established surveillance at 6535 West 16th Street. At approximately 7:00 p.m., officers observed the defendant, Jose Arreola, exit the residence and enter a Chevy Malibu. (*Id.* 56.) The officers followed the Malibu to the Walgreen's parking lot. At this time, the officers observed Arreola exit the vehicle, greet two other men, and the officers watched all the men enter Arreola's vehicle. (*Id.* 57.) The defendant then drove around the immediate area for a short amount of time before going to Los Comales Restaurant, where the defendant parked and all went inside. About twenty minutes later, Arreola left the restaurant, got back into his vehicle and went home. (*Id.*)

Ten minutes after arriving home, Arreola and his wife, Adelaida, were observed leaving their home, entering their vehicle, and driving to Walgreen's. (*Id.*) Once they arrived at the Walgreen's parking lot, Adelaida entered the store, and Arreola was observed looking around in different directions in the parking in and into other vehicles that were parked in the lot. He then began talking again to the gentlemen he had gone to the restaurant with earlier, as they had also just returned to the parking lot from the restaurant. (*Id.* 58.) All three men entered the truck belonging to the other men. The men drove around for about five minutes and returned to the Walgreen's parking lot where Arreola exited the vehicle and entered the store. (*Id.* 58-59.) The other men then departed from the Walgreen's. Arreola and his wife departed from the Walgreen's. Adelaida had with her some groceries, including milk and eggs. (*Id.* 128-29.) The couple walked to their vehicle, entered, and drove home.

3

Up to this point the defendant and the government essentially agree on the facts. At this juncture, however, their versions of what occurred diverge radically. Officer Carvajal testified that the defendant parked his vehicle some distance from his home. The officers, having followed him home, parked behind him and approached him while he and his wife were still in the car. Officer Carvajal testified that he did not force the defendant to stop in any way. (*Id.* 60-61.) According to Officer Carvajal, he approached the defendant's vehicle, identified himself, and after learning that the defendant spoke no English, engaged him in a discussion in the Spanish language. Not wanting to discuss matters in the presence of his spouse, the defendant agreed to continue the conversation at the rear of the vehicle. Officer Carvajal informed the defendant that he had information that the defendant was involved in the sale of narcotics, specifically cocaine. He also informed the defendant that they had observed him "make several meets the night before" and had observed the duffel bags being taken from his vehicle. The defendant denied he was involved in any narcotic sales and offered to allow the officer to check his house and his vehicle. Officer Carvajal informed him that he would like to have that permission in writing and presented the defendant with a consent form, explained to him what it was and read it to him, and "filled out the boxes indicating my name." He then gave the defendant the form. It appeared to the officer that the defendant was reading the form before he signed it.

The form, admitted in evidence as Government Ex. 1, was in the Spanish language.[1] During this entire process, according to Officer Carvajal, he spoke in a conversational tone, the defendant was not under arrest or detained, was free to leave and was not handcuffed or

---

[1] Subsequently, the parties stipulated to the introduction of Gov't Ex. 1-A, and that the back of Gov't Ex.1-A is a true and accurate translation of the Spanish language consent form admitted as Government Ex. 1.

4

restrained in any way. Further Officer Carvajal never drew his weapon. (*Id.* 70-71, 73-74.) Mrs. Arreola's description of what occurred differs radically in almost every respect.

According to the defendant's spouse, the officers forced her husband to stop his vehicle by pulling their vehicle across the defendant's path and blocking him from continuing. They then demanded that he park his vehicle. An officer approached the defendant from the driver side of the vehicle with his gun drawn and the defendant was then pulled out of his vehicle and surrounded by three officers. In a loud, angry voices the officers accused him of having committed drug offenses. Specifically, the officers told him that they had observed him meeting with individuals at the Walgreen's and they knew that he was "El Viejo." They accused him of delivering drugs and demanded that he sign the consent to search form. This intense pressure to sign the consent form continued for some ten minutes. The form was never read to Mr. Arreola. Finally, the form was placed on the hood of the car and Mr. Arreola was forced to sign it.

If one credits the testimony of Mrs. Arreola, then, the defendant's vehicle was stopped by the police, his freedom restrained and his consent to the search of his home was not voluntary. Under these facts, even if the stop of the defendant's car was a valid stop under the principles of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968), as argued by the government, the subsequently obtained consent to search was not voluntary. According to Officer Carvajal's testimony, the defendant's vehicle was not stopped, his freedom was never restrained and his consent to the search of his home was completely voluntary. If we believe Officer Carvajal, then there was no

5

Fourth Amendment "seizure" requiring probable cause or reasonable suspicion. *See United States v. Wade*, 400 F.3d 1019, 1021-22 (7th Cir. 2005).

### III. Discussion

Clearly, as the government suggests in its response to the defendant's memorandum, the resolution of the defendant's motion to suppress will turn on the Court's determination of the credibility of the witnesses. If Mrs. Arreola's testimony is credited, then there was no voluntary consent and the warrantless search can not stand. But, Mrs. Arreola's testimony suffers from major inconsistencies which undermine its weight.

Mrs. Arreola testified through a Spanish language interpreter. At various points during the course of her testimony, Mrs. Arreola insisted that the officers were speaking to her husband in English, not in Spanish, although, at other times, she indicated that one officer spoke Spanish. Her testimony as to who said what and in what language is confusing. Although she does not speak or understand English well, she nevertheless insisted that she understood what the officers were saying, not because she understood the words – she specifically admitted she could not understand the words spoken in English – but because she could tell what they were saying from the fierce expressions on their faces. Her testimony on this point is contradictory and inconsistent. Although she testified that one officer did speak Spanish, her testimony in the main appears to be that the conversation she described at the front of the car with her husband was in English. Clearly, at least some of the conversation had to be in English as she testified that all three officers surrounded her husband and spoke to him at once, while only one officer was

6

capable of speaking Spanish. Given that she also testified that her husband spoke and understood almost no English, one wonders how the conversation could have taken place. Further, she insists that even though she could not understand the words spoken by the officers in English, she nevertheless understood what they were saying by virtue of the fierce expressions on their faces. This testimony is just not credible. While one may be able to read a person's emotions from his facial expressions, it is not possible by any skill known to the Court to understand the content of a foreign language conversation merely from the "fierceness" of a participant's facial expressions.

In this regard, Mrs. Arreola's testimony is hopelessly confused. It is completely unclear how much of what Mrs. Arreola testified to is conjecture based upon her belief that she could understand what was being said by observing the expressions on the faces of the police officers, and how much, if any, stems from hearing and understanding the actual content of the exchange between the police and Mr. Arreola. For example, she testified that the police officer who approached her car and asked her husband for his identification. (Tr. 112.) Was he speaking in English or in Spanish? If in English, how did she understand what was said? She indicated, after all, that the officer who approached the vehicle was speaking English to her husband. (*Id.*) The same problem exists with her testimony describing how the officers told her husband their observations and their suspicions that he was a drug dealer, as well as her testimony regarding the signing of the consent to search form. For this reason, the Court finds that Mrs. Arreola's testimony as a whole lacks credibility.

Finally, Mrs. Arreola's testimony is contradicted directly by the testimony of DEA Special Agent John Kennelly in one important aspect. Special Agent Kennelly testified that he was present at the defendant's home when Mr. and Mrs. Arreola arrived, having been informed that Mr. Arreola had signed a consent. He observed the defendant and his wife exit the back of Officer Carvajal's vehicle and walk to the house. Neither of them was handcuffed at any time from the time they exited the vehicle to the time they entered the residence. This testimony directly contradicts Mrs. Arreola's testimony that she and her husband were handcuffed together when they were placed in Officer Carvajal's car and remained that way as they entered the house.

Defendant argues that some of Officer Carvajal's testimony is inherently incredible. For example, defendant points out that the officer's version of the facts is that blocks away from their home, in a residential area, with groceries, including milk and eggs, in the car, the couple parked their car, and were sitting in it for some time. As the couple sat in their car, the officers parked their own vehicle a couple of parking spots away from the defendant's car, exited their vehicle and walked up to the defendants who were still seated in their own vehicle. That the defendant would park a distance from his home with groceries in the car is, defendant argues, incredible.

But this argument ignores prior uncontested testimony of the defendant's rather strange comings and goings for two successive days in two different automobiles. Prior to the time of the search, the defendant met strangers in parking lots, climbed in their cars and back out, had them in his car, drove around the area for several minutes on two occasions for no apparent reason with strangers then returned, went into the Walgreen's and came out shortly and went into a restaurant and then returned to the parking lot at the Walgreen's. Further, he drove his vehicle

to an alley to allow another person to come out of a house, through a gangway, and unload two duffel bags from his trunk. The complete sequence of events is described above in detail; the point here is that defendant can hardly claim that because the officer's description of where defendant parked his car and what he was doing seems a bit strange it should be disbelieved.

The defendant's known and uncontested behavior prior to that was even more strange, yet true. If one assumes that the defendant was simply driving home, then it would be unusual for him to park a block or two away from his residence. However, given his prior odd behavior, it is not at all certain or even likely that the defendant was intending to drive home at that time. He may very well have been waiting to go back to the Walgreen's parking lot or to some other meeting place. Nor is there any testimony on the record that the defendant was not accustomed to parking some distance from his home even when he was going home. Mrs. Arreola could have testified to this, but did not. If, indeed, he was a major drug dealer as the informant claimed, parking away from his home might be some sort of precautionary measure.

Defendant also argues that the manner in which the questioning took place makes it unclear as to what portions of the conversation with Mr. Arreola were in Spanish and what portions where in English and that Mrs. Arreola could very well have been testifying to the content of the conversation which she overheard in the Spanish language. The Court agrees, as pointed out above, that the record is confused as to what portions of the conversation Mrs. Arreola claims to have understood were in English. What is clear, however, is that Mrs. Arreola claims to have understood the conversations in English by virtue of her observations of the facial

9

expressions of the police officers even though she did not understand the words. This testimony undermines her credibility and suggests a strong desire to testify favorably for her husband.

In short, the Court finds Officer Carvajal's testimony far more credible than that of Mrs. Arreola.

## Conclusion

For the reasons set forth above, Arreola's motion to suppress the 233 kilograms of cocaine gathered as a result of the search of his home on November 17, 2005 is denied.

**SO ORDERED.**　　　　　　　　　　ENTERED: 8/7/07

*Ronald A. Guzmán*
**RONALD A. GUZMÁN**
United States District Judge

G:\00-LAURE\arreola2.doc